**COURT OF APPEALS
DECISION
DATED AND FILED**

**March 20, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2023AP2018-FT**

**STATE OF WISCONSIN**

Cir. Ct. No. 2015ME143

**IN COURT OF APPEALS
DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF C.B.

RACINE COUNTY,

    PETITIONER-RESPONDENT,

  V.

C.B.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Racine County: WYNNE P. LAUFENBERG, Judge. *Affirmed.*

¶1    GUNDRUM, P.J.[1] C.B., referred to herein with the pseudonym "Calvin Banks,"[2] appeals from an order extending his involuntary commitment under Wis. Stat. ch. 51 and a related order allowing for the involuntary administration of medication and treatment.   Banks contends we must reverse because (1) "[t]he circuit court failed to make appropriate findings to support recommitment" and "[t]he evidence was otherwise insufficient to recommit" and (2) "[t]he medication order was unsupported by sufficient evidence."   For the following reasons, we disagree on all points and affirm.

## *Background*

¶2    In November 2015, Banks was emergently detained after he fled from police while operating a stolen vehicle.[3]   He was committed under Wis. Stat. ch. 51 for six months at Winnebago Mental Health Institute, and he has been under continuous ch. 51 commitment since.   On March 14, 2023, the County filed a petition to again extend his commitment and sought an involuntary medication and treatment order.   The circuit court held a hearing on the petition on May 9, 2023, at which the following relevant evidence was presented.

¶3    Doctor William Bjerregaard, a licensed psychiatrist, testified that he had performed an examination of Banks approximately two weeks before the

---

[1] This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] We use a pseudonym because we believe it makes the decision easier to read and is more humanizing than initials.

[3] The events occurred in July 2014.   Banks was criminally charged and found not competent to proceed.   His commitment pursuant to his not guilty by reason of insanity (NGI) plea was subsequently converted to a commitment under Wis. Stat. ch. 51.

recommitment hearing. As part of the evaluation, he also considered a March 6, 2023 report by County crisis counselor Angela Townsend as well as a previous recommitment report he prepared on April 25, 2022. Bjerregaard had examined Banks at least twice before related to prior recommitments. When asked by the County "what if any psychotropic medications … were being administered to" Banks, Bjerregaard responded, "He did say very long-acting antipsychotic agent Invega Hafyera, which is given every six months and he also gets some oral antipsychotic medications. Risperidone, 2 milligrams twice per day. Quetiapine or Seroquel, 100 milligrams at bedtime."

¶4 Bjerregaard noted Banks' legal history "of stealing several cars" and that Banks indicated his initial commitment related to "stealing a car and fleeing police, resulting in a somewhat high-speed situation where he was about double the speed limit." Bjerregaard stated that Banks "denies that he drove into oncoming traffic but realizes that they were concerned about that."

¶5 Bjerregaard testified that Banks "suffers from chronic paranoid schizophrenia" but does not believe he has a mental illness and "[d]oes not see a need for any form of treatment." Bjerregaard added that "some people with schizophrenia have no insight and in [Banks'] case that's his difficulty with the illness is that he lacks any insight and because of that, it impairs his judgment." When asked if "based on [Banks'] treatment record and based on his not being willing to acknowledge he has a mental illness, is there a substantial likelihood that [Banks] would be a proper subject for commitment if his treatment were withdrawn," Bjerregaard responded, "Yes." When asked if that is "because he'd be a substantial probability of physical harm to himself," Bjerregaard answered, "It's potential, given that he does dangerous things when he's not in treatment, such as driving a car at a high speed after stealing it." When asked if there is "a

substantial probability of physical harm to others as well," Bjerregaard stated, "Yes, when he drove into oncoming traffic there was concern about … him harming others."

¶6 When asked if Banks "would stop treatment if there was not a court order," Bjerregaard stated, "Yes, he has no interest in taking medication." If Banks was not on medication, Bjerregaard continued, his psychosis would get worse, and Bjerregaard is concerned that Banks "would get back into" stealing cars, which he has done "at least three times in the past."

¶7 Bjerregaard testified that he "discussed the medications, their benefits, side effects, and alternative treatments" with Banks and agreed that he "explained the advantages, disadvantages, and alternatives to recommended medication" to him. Bjerregaard acknowledged that Banks is capable of discussing the advantages, disadvantages, and alternatives but agreed he is "substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to his condition in order to make an informed choice as to whether to accept or refuse recommended medication or treatment." Banks' inability to apply an understanding of these matters to his condition is due to his belief that he "has no mental illness," and Banks has stated he "does not want to see a psychiatrist or continue with any psychiatric medication." Bjerregaard confirmed that Banks' mental illness "[i]s the cause of Mr. [Banks'] incapability to apply an understanding of the medications." Bjerregaard testified that compared to his past evaluations of Banks, at his most recent evaluation, Banks was "less revealing," adding that Banks appeared "a little more organized in his thinking, but he is not able to discuss some of the past problems he's had … as well as he did in the past."

¶8 On cross-examination, Bjerregaard explained that Banks' "guardedness exposes more about his prior symptoms … than … [his] prior legal problems." Bjerregaard also expressed that he is

> concerned about the oral medication that [Banks is] on, if he's taking it regularly. He was somewhat vague about that in terms of the risperidone, how often he took that. It's twice a day and he wasn't real clear on that. During the interview, his brother walked by in the background and made some comments … impl[ying] that he wants to make sure [Banks] takes his medicine…. [S]o that brought up some questions in my mind when I saw that.

¶9 Bjerregaard's examination report, dated April 25, 2023, was received into evidence. While that report mirrors much of Bjerregaard's testimony, it includes additional information. As to information obtained from Banks related to his history, Bjerregaard's report states: "Recalls prison time 2010 to 2014 for burglary & ?'1st'? psychiatric inpatient was in 2015. Has been to Winnebago 'a few times' & WRC 'a couple times' & Mendota once 'in '95 for competency.'" Banks also told Bjerregaard, "They found me incompetent to stand trial for stealing a car & fleeing & eluding—I thought I had an escape route. I didn't cross into oncoming traffic like the police said I did. I ran when I got out of the car but I didn't resist when they caught me."

¶10 In the report, Bjerregaard identifies that Banks "is dangerous because he … evidences [both]:

> (1) A substantial probability of physical harm to himself … as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm.
>
> Additional standard available for recommitment hearings: based on a review of the subject's treatment record, there is a substantial likelihood that the subject would become a proper subject for commitment under this standard if treatment were withdrawn.

> (2) A substantial probability of physical harm to other subjects as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.
>
> <u>Additional standard available for recommitment hearings</u>: based on a review of the subject's treatment record, there is a substantial likelihood that the subject would become a proper subject for commitment under this standard if treatment were withdrawn.

Next to "serious bodily harm" in subsec. (1), Bjerregaard handwrote, "History of driving car dangerously," and next to the last use of "serious physical harm" in subsec. (2), he handwrote, "History of reportedly turning into oncoming traffic."

¶11 In the section of the report asking for "[r]elevant information relative to dangerousness," Bjerregaard wrote that Banks "[s]tates 'I was in a high speed chase (double or more the speed limit) when I tried to escape from the police.'" Bjerregaard added that Banks "[w]ants to stop medicine which would worsen his paranoia & increase risk for dangerous behavior." Related to "[i]nvoluntary [m]edication or [t]reatment," Bjerregaard wrote that Banks "[n]eeds paranoia contained to prevent impulsive dangerous behavior."

¶12 In the report, Bjerregaard indicates that he "explain[ed] the advantages, disadvantages, and alternatives to the recommended medication" to Banks, stating that he explained the advantages of "[d]ecrease paranoia & confusion" and "[p]revent voices & visions," the disadvantages of "[s]edation, weight gain, movement disorders," and the alternatives of "[o]ther antipsychotics." Bjerregaard notes in the report that Banks is "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his … condition in order to make an informed choice as to whether to accept or refuse

the recommended medication," adding that Banks "[s]tates 'I don't have a mental illness & don't need to see a psychiatrist or counsellor—I don't want medicine.'"

¶13 Angela Townsend testified next. Banks' initial commitment, she stated, stemmed from an incident in 2014 where he was charged with operating a vehicle without the owner's consent and resisting arrest. She testified, without objection, that "[w]hen officers attempted to stop him, he increased his speed and went into ongoing[4] traffic." She stated that Banks was "found incompetent" and "[h]is NGI was converted to a Chapter 51 in November … 2015."

¶14 She has been involved with Banks' case since his initial commitment in 2015, and in that entire time, Banks has never acknowledged he has a mental illness. She expressed concern that Banks has told her "on multiple occasions," including multiple times during his present commitment, "that he does not have a mental illness and that he only takes his medications because he is court-ordered to do so." Banks also told Townsend "that if the order was to expire, he would not see Kristi [Moriarty, Banks' outpatient provider for medications] or take medications." Townsend confirmed that Moriarty also "endorsed having … this recommitment." Townsend testified that she is concerned that Banks would "become symptomatic" without medications, meaning "[h]e would become paranoid. He would hear voices and possibly commanding voices, which would tell him to do things that he normally wouldn't do if he was medicated." She agreed that "in the past, that's meant taking and driving cars without permission," which she further agreed has happened "on at least three occasions."

---

[4] We assume Townsend meant "oncoming," not "ongoing," traffic.

¶15    The circuit court found inter alia that Banks suffers from schizophrenia, which impairs his judgment, and he "lacks any insight" into his illness. The court noted that Banks' schizophrenia has caused problems for him in the past "when he's not been medicated," specifically referencing the testimony about Banks' "dangerous" criminal conduct of "fleeing law enforcement." The court added that "the criminal activity *that was testified about* is *extremely dangerous conduct*. Driving a vehicle, fleeing from police puts not only [Banks] in danger but also everybody in the community that happens to be on the road in the area where somebody is fleeing." (Emphases added.)

¶16    The circuit court noted that an alternative way of proving dangerousness in a recommitment hearing is "by showing that there is a substantial likelihood based on the subject individual's treatment record that the individual would be a proper subject for commitment under one of the five dangerousness standards if treatment were withdrawn." The court then added,

> [a]nd here's where we are at with [Banks] right now, is his continued position that he doesn't have a mental illness and that he doesn't need medications creates that circumstance of no insight into what is, again, … a very serious mental health diagnosis. And *to leave it untreated* would certainly put [Banks] in harm's way *based upon his history here*.

(Emphases added.) The court found that Banks "does not believe he suffers from a mental illness. Further, that he doesn't need medications and if he wasn't on a court order, he would not be taking medications." The court added that Banks' continued denials that he has a mental illness and needs medication "puts him at risk and puts him at risk *based on his prior behavior* with respect to *harm to others as well as himself*." (Emphases added.)

8

¶17     The circuit court determined it necessary to continue the involuntary medication order because of the above—including that Banks believes he does not suffer from a mental illness, does not need medication, and insists he will not take the medication unless under a court order—and because Banks' mental illness "is a treatable disorder, obviously treated by the medications that he's on" and "[i]t has caused problems in the past for [Banks] when he's not been medicated." The court concluded that Banks is "unable to discuss and apply—understand the pros and cons, but also then apply his judgment with respect to the risk and benefits of medications at this time" and that to leave Banks' condition untreated would "certainly put" Banks and others "in harms way based upon his history here."

¶18     Banks appeals.

### *Discussion*

¶19     An individual is a proper subject for a recommitment under WIS. STAT. § 51.20(1) if the county proves by clear and convincing evidence that the individual is mentally ill, a proper subject for treatment, and dangerous. *See Langlade County v. D.J.W.*, 2020 WI 41, ¶31, 391 Wis. 2d 231, 942 N.W.2d 277; § 51.20(13)(e). We do not disturb a circuit court's findings of fact "unless they are clearly erroneous," and we accept all reasonable inferences from those facts. *Outagamie County v. Melanie L.*, 2013 WI 67, ¶38, 349 Wis. 2d 148, 833 N.W.2d 607. Banks does not dispute the circuit court's conclusions that he is mentally ill and a proper subject for treatment. He insists, however, the court erred in concluding the County met its burden to prove he is dangerous. Banks also claims the court erred in concluding the County met its burden under WIS. STAT. § 51.61(1)(g)4.b. to prove by clear and convincing evidence that he is incompetent to refuse medication. *See* § 51.20(13)(e). "In evaluating whether the

9

County met its burden of proof, a court must apply facts to the statutory standard in ... § 51.61(1)(g)4.b. and interpret the statute. Applying facts to the standard and interpreting the statute are questions of law that this court reviews independently." *Melanie L.*, 349 Wis. 2d 148, ¶39.

*Circuit Court's Findings and Sufficiency of the Evidence for Recommitment*

¶20    Banks complains that the circuit court "failed to comply with" directives from *D.J.W.*, 391 Wis. 2d 231, ¶40, "by failing to cite any of the five specific statutory dangerousness standards in its *oral ruling*." (Emphasis added.) He criticizes the court's oral ruling for failing to reference "a specific statutory citation" and "fail[ing] to precisely recite any specific statutory language." Banks also faults the court for using the term "risk" in its oral ruling instead of the statutory language of "substantial probability." For these reasons, he asserts that on appeal we are "left to guess at the rationale for the court's recommitment order." Additionally, Banks claims the evidence presented at the hearing was itself insufficient to support the circuit court's determination that he is dangerous. We disagree with Banks.

¶21    To begin, no guesswork is needed because the basis for the order is clear. First, in his report, which was received into evidence, Bjerregaard unmistakably indicates that in his opinion Banks is dangerous because he meets the first and second statutory dangerousness standards "by way of the recommitment alternative." *See Sauk County v. S.A.M.*, 2022 WI 46, ¶32, 402 Wis. 2d 379, 975 N.W.2d 162. Although his report does not utilize the statutory cites of WIS. STAT. § 51.20(1)(a)2.a., b. and (1)(am), the language fully tracks those statutory provisions such that there can be no question as to which statutory sections Bjerregaard is referring to.

¶22    More importantly, in its written order, signed the same day as the hearing, the circuit court stated that it determined Banks to be dangerous "because [he] evidences one or more of the standards under [WIS. STAT.] § 51.20(1)(a)2. … in combination with § 51.20(1)(am)," specifically identifying that Banks evidences "a substantial probability of physical harm to himself" and "a substantial probability of physical harm to other individuals" as "manifested or shown by:  … a substantial likelihood, based on [Banks'] treatment record, that [he] would be a proper subject for commitment if treatment were withdrawn." And, in its on-the-record comments at the end of the evidentiary hearing, the court made clear that the substantial probability of harm to Banks himself and others was Banks' "extremely dangerous" precommitment conduct of "[d]riving a vehicle, fleeing from police" that "puts not only [Banks] in danger but also everybody in the community that happens to be on the road in the area where somebody is fleeing."  Engaging in a high speed chase with police is unquestionably dangerous conduct that places Banks and others in danger.

¶23    The circuit court expressed that Banks' continued denials that he has a mental illness and needs medication places him and others at risk based upon his "prior behavior."  The court recognized that in a recommitment hearing, "the government can alternatively prove dangerousness by showing that there is a substantial likelihood based on the subject individual's treatment record that the individual would be a proper subject for commitment under one of the five dangerousness standards if treatment were withdrawn."  The court then immediately stated,

> And here's where we are at with [Banks] right now, is his continued position that he doesn't have a mental illness and that he doesn't need medications creates that circumstance of no insight into what is, again, … a very serious mental

11

> health diagnosis. And *to leave it untreated would certainly put [Banks] in harm's way* based upon his history here.

(Emphasis added.) Before the court made its "risk" comment that Banks criticizes, it refers back to the "substantial likelihood" recommitment standard noted above:

> Court will find then, with respect to the other standard that I can look at, which I just quoted with respect to a recommitment, that [Banks'] continual verbal statements that he does not have a mental health diagnosis. That he does not need medications puts him at risk and puts him at risk based on his prior behavior with respect to harm to others as well as himself.

Though a bit inartful, the court was effectively saying that there is a substantial likelihood that if Banks' treatment is withdrawn, he "would be a proper subject for commitment," which means, inter alia, his dangerous behavior would recur.[5] Moreover, in its written order, the court specifically indicates that Banks is dangerous because he evidences "a substantial probability of physical harm to himself" and "to other individuals." Banks cites to no law indicating a court's written determination of dangerousness signed the same day as its oral ruling does not suffice for identifying the specific dangerousness provision the court's

---

[5] As the ***Langlade County v. D.J.W.*** court stated: "WISCONSIN STAT. § 51.20(1)(am) 'recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur.'" 2020 WI 41, ¶33, 391 Wis. 2d 231, 942 N.W.2d 277 (citation omitted).

determination is grounded on. Scouring through ***D.J.W.*** ourselves, we do not find it there.[6]

¶24 In ***D.J.W.***, "[i]t was not clear … on which subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. the commitment was based." ***D.J.W.***, 391 Wis. 2d 231, ¶36. Here, the circuit court's on-the-record comments at the hearing, particularly when connected with the written order signed the same day, leave no doubt that the court's determination that Banks is dangerous is grounded in both § 51.20(1)(a)2.a. & b.,[7] "as viewed through the lens of § 51.20(1)(am)." *See* ***D.J.W.***, 391 Wis. 2d 231, ¶50. The requirement of ***D.J.W.*** that circuit courts "provide specific factual findings with reference to the subdivision paragraph of … § 51.20(1)(a)2. on which the recommitment is based" was founded on that court's interest in "provid[ing] clarity and extra protection to patients regarding

---

[6] Banks complains that the circuit court's oral ruling was insufficient, and he essentially asserts we should not consider the written order signed by the court the same day. Citing ***State v. Perry***, 136 Wis. 2d 92, 401 N.W.2d 748 (1987), he states that "[w]here there is a conflict between a written order and the judge's on-the-record determination, it is well-settled that the oral pronouncement controls." This of course goes nowhere as there is no "conflict" between the court's on-the-record determination and its written order. Indeed, the court's same-day written order is complementary to its oral ruling.

Banks also intimates that the court's written order amounted to nothing more than a "mere[] rubberstamp[ing]" of a form. First, we do not consider this argument as it is insufficiently developed. *See* ***Clean Wis., Inc. v. PSC***, 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments."). Second, while Banks essentially asserts we should give the written order no weight because the court engaged in "rubberstamping" by utilizing a "pre-filled form" for its order, others would likely view the court's utilization of a standardized form as a conscientious way to make sure the court sufficiently addressed all necessary matters.

[7] We note that at Banks' prior recommitment hearing, held one year earlier and with the same judge presiding, Banks stipulated to his recommitment—which necessarily means he stipulated to his dangerousness—and the circuit court determined Banks dangerous pursuant to WIS. STAT. § 51.20(1)(a)2.b., concluding he evidenced "a substantial probability of physical harm to other individuals."

the underlying basis for a recommitment," "provid[ing] increased protection to patients to ensure that recommitments are based on sufficient evidence," and "clarify[ing] issues raised on appeal of recommitment orders and ensur[ing] the soundness of judicial decision making." ***D.J.W.***, 391 Wis. 2d 231, ¶¶42-44. The court's oral ruling and written order here accomplish all of these goals.

¶25 Banks also criticizes the circuit court for not providing enough "descriptive detail" related to his earlier incident that led to his initial commitment—engaging in a high-speed chase with the police. We do not believe more details were needed. Bjerregaard testified that Banks admitted to him that he was in a "high-speed situation" with police and Townsend indicated, without objection, that Banks was charged in connection with the incident, specifically stating that "[w]hen officers attempted to stop him, he increased his speed." The court expressed its concern with Banks' "extremely dangerous conduct," and we agree—Banks' conduct constitutes evidence of an attempt at serious bodily harm, *see* WIS. STAT. § 51.20(1)(a)2.a., as well as "violent behavior," *see* § 51.20(1)(a)2.b.[8] The testimony was sufficient as were the court's comments related to it.

---

[8] With regard to WIS. STAT. § 51.20(1)(a)2.b., Banks criticizes the circuit court for "fail[ing] to discuss [in its on-the-record comments] not only the 'substantial probability' component but also the alternative 'reasonable fear' criterion." He adds that "[w]hen the statutory dangerousness standards have multiple elements, the circuit court's ruling needs to track those elements." Banks' criticism is misplaced as subd. para. b. could be met either by Banks "evidenc[ing] a substantial probability of physical harm to other individuals" *or* "by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them." Here, the court found that subd. para. b. was met ("by way of the recommitment alternative" of para. (1)(am), *see* ***S.A.M.***, 402 Wis. 2d 379, ¶32) because Banks "evidence[d]" "a substantial probability of physical harm to other individuals." Sec. 51.20(1)(a)2.b. As a result, there was no legal requirement or need for the court to have addressed the alternative "reasonable fear" avenue for satisfying subd. para. b.

¶26 Townsend also testified that Banks told her on multiple occasions

> that he did not have a mental illness [and] that medications were not helpful because he did not have a mental illness and that he was only taking medications because he was court-ordered to do so. He also reported that if the order was to expire, he would not see Kristi [Moriarty, Banks' outpatient provider for medications] or take medications.

Townsend expressed her concern "that without medications he would become symptomatic," meaning "[h]e would become paranoid. He would hear voices and possibly commanding voices, which would tell him to do things that he normally wouldn't do if he was medicated." She agreed that Banks' past behavior of "taking and driving cars without permission" is an example of the type of behavior she is concerned about. Townsend agreed that that specific type of behavior had happened "on at least three occasions."

¶27 Considering the totality of the evidence presented, the County presented sufficient evidence to support the circuit court's recommitment order.

*Sufficiency of the Evidence for the Medication Order*

¶28 Banks contends the evidence presented at the hearing was insufficient to support the involuntary medication order under WIS. STAT. § 51.61(1)(g)4. because he "did not receive a reasonable explanation" related to medication and/or because the County failed to prove he "was unable to apply an understanding" related to medication. We conclude the evidence sufficiently supports the medication order.

¶29 "[U]nder WIS. STAT. § 51.61, a person has the right to refuse medication unless a court determines that the person is incompetent to make such a decision." *Melanie L.*, 349 Wis. 2d 148, ¶53. As relevant to this case, the

County establishes a person's incompetency to refuse medication by proving by clear and convincing evidence that due to mental illness

> and after the advantages and disadvantages of and alternatives to accepting the particular medication ... have been explained to the individual, one of the following is true:
>
>     a. The individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.
>
>     b. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his ... mental illness ... in order to make an informed choice as to whether to accept or refuse medication or treatment.

*See* § 51.61(1)(g)3., 4.; WIS. STAT. § 51.20(13)(e).

¶30 Banks first contends the County failed to present sufficient evidence that "the advantages and disadvantages of and alternatives to accepting the particular medication … ha[d] been explained to" him. *See* WIS. STAT. § 51.61(1)(g)4. We disagree.

¶31 To begin, Banks erroneously asserts that "Bjerregaard's testimony also did not identify a specific medication." In actuality, Bjerregaard identified the three specific medications being administered to Banks, testifying that during his April 25, 2023 recommitment evaluation with Banks, Banks indicated he was being administered "[the] very long-acting antipsychotic agent Invega Hafyera, which is given every six months and he also gets some oral antipsychotic medications. Risperidone, 2 milligrams twice per day. Quetiapine or Seroquel, 100 milligrams at bedtime." Bjerregaard also identified in his report that these three medications were being administered to Banks "via Kristi Moriarity NP."

16

¶32    Bjerregaard testified he discussed "the medications" with Banks and "their benefits, side effects, and alternative treatments" and relatedly confirmed he had "explained the advantages, disadvantages, and alternatives to recommended medication or treatment" with Banks. In his report, Bjerregaard also indicates he explained "the advantages, disadvantages, and alternatives to the recommended medication," specifically stating that he explained "[d]ecrease paranoia & confusion" and "[p]revent voices & visions" (advantages), "sedation, weight gain, movement disorders" (disadvantages), and "other antipsychotics" (alternatives).

¶33    Although Bjerregaard explained to Banks the possible medication disadvantages/side effects of "sedation, weight gain, movement disorders," he claims on appeal that this was "woefully insufficient" because it did not include a list of possible side effects identified in drug company warnings or a Wisconsin Department of Health Services informed consent form. This complaint goes nowhere as he raises these concerns for the first time on appeal. *Brooks v. Hayes*, 133 Wis. 2d 228, 241, 395 N.W.2d 167 (1986) (We "will not consider arguments raised for the first time on appeal."). Moreover, specifically as it relates to the sufficiency of the "disadvantages" explanation, Banks directs us to no legal support for his apparent contention that a doctor must discuss every possible side effect identified by a drug company, DHS, or any other organization.

¶34    As to Bjerregaard's discussion with Banks of "alternatives," the record indicates Bjerregaard discussed alternative antipsychotic medications with Banks. Banks claims this was insufficient because "[c]ounseling or other forms of therapy were … not offered." We do not consider this argument as it is insufficiently developed—only two sentences address it—and Banks provides no legal support for his apparent position that the "offer[ing]" of "[c]ounseling or other forms of therapy" is required for an explanation of "alternatives" to be

sufficient, *see ABKA Ltd. P'ship v. Board of Rev.*, 231 Wis. 2d 328, 349 n.9, 603 N.W.2d 217 (1999) ("[We] will not address undeveloped arguments."); *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered."), especially where the medical professional questions whether counseling would be a good fit, as Bjerregaard testified that counselling "might be helpful, but frustrating for a counselor since [Banks] states he has no mental illness. Does not see a need for any form of treatment."

¶35 Banks also contends the County did not prove he was unable to "apply an understanding" of the advantages, disadvantages, and alternatives of the medication to his mental illness "in order to make an informed choice as to whether to accept or refuse medication," as required by WIS. STAT. § 51.61(1)(g)4.b. He claims the evidence merely shows that Banks "disagrees" with Bjerregaard about the need for medication. Banks fails to persuade as the evidence established much more than a mere "disagreement."

¶36 Pursuant to WIS. STAT. § 51.61(1)(g)4., the County needed to show that Banks was *either* "incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives" *or* "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his ... mental illness ... in order to make an informed choice as to whether to accept or refuse medication or treatment." In *Melanie L.*, our supreme court rephrased this latter requirement as "requir[ing] a person to *make a connection between* an expressed understanding of the benefits and risks of medication and the person's own mental illness." 349 Wis. 2d 148, ¶71.

¶37 Here, Bjerregaard acknowledged that Banks is capable of "expressing an understanding of the advantages, disadvantages, and alternatives" to the medication he is administered—the requirement of WIS. STAT. § 51.61(1)(g)4.a.—stating that Banks "can discuss … that information with me." Bjerregaard agreed, however, that Banks is "substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to his condition in order to make an informed choice as to whether to accept or refuse recommended medication or treatment"—the requirement of § 51.61(1)(g)4.b. Bjerregaard agreed that Banks' inability to apply an understanding of the medications to his mental illness was because of his mental illness—that because of his mental illness, Banks lacks insight, which impairs his judgment. Bjerregaard testified that Banks is unable to apply an understanding of medications to his mental illness because he does not believe that he has a mental illness and "[d]oes not see a need for any form of treatment." Bjerregaard added that "some people with schizophrenia have no insight and in [Banks'] case that's his difficulty with the illness is that he lacks any insight and because of that, it impairs his judgment." In his report, Bjerregaard similarly indicated that Banks was substantially incapable of applying an understanding of the medications to his illness because he "states 'I don't have a mental illness & don't need to see a psychiatrist or counsellor—I don't want medicine.'" Similarly, Townsend testified that Banks told her on multiple occasions "that medications were not helpful *because he* [*does*] *not have a mental illness*[9] and that he was only taking medications because he was court-ordered to do so." (Emphasis added.)

---

[9] Again, the circuit court determined that Banks does have a mental illness, and Banks does not challenge this determination on appeal.

¶38 In *Melanie L.*, our supreme court stated that it is "logical[]" that "if a person cannot recognize that he or she has a mental illness, … the person cannot establish a connection between his or her expressed understanding of the benefits and risks of medication and the person's own illness." 349 Wis. 2d 148, ¶72. The evidence presented sufficiently established that here. The circuit court's determination, as stated in its written medication order, that Banks "is not competent to refuse psychotropic medication … because [he] is … substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his … condition in order to make an informed choice as to whether to accept or refuse psychotropic medications" is sound and sufficiently supported by the evidence.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.